**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

<table>
<tr><td>CYNTHIA PAZOS,</td><td>)</td><td></td></tr>
<tr><td style="text-align:right">Petitioner,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>C.A. No. N23C-02-164</td></tr>
<tr><td></td><td>)</td><td>PRW CCLD</td></tr>
<tr><td>ADAPTHEALTH LLC,</td><td>)</td><td></td></tr>
<tr><td style="text-align:right">Respondent.</td><td>)</td><td></td></tr>
</table>

Submitted: April 11, 2024
Decided: July 30, 2024
Issued: August 12, 2024*

*Upon Respondent's Motion to Dismiss,*
**GRANTED.**

*Upon Petitioner's Motion for Summary Judgment,*
**DENIED.**

## <u>MEMORANDUM OPINION AND ORDER</u>

Kelly E. Farman, Esquire, Matthew W. Murphy, Esquire (*argued*), Edmond S. Kim, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Petitioner Cynthia Pazos*.

Steven L. Caponi, Esquire (*argued*), Matthew B. Goeller, Esquire, Megan E. O'Connor, Esquire, K&L GATES LLP, Wilmington, Delaware, *Attorneys for Respondent AdaptHealth LLC*.

**WALLACE, J.**

_____

\* This decision is issued after providing the parties an opportunity to request redaction of certain confidential information—none were made—and with the Court's own necessary corrections.

Petitioner Cynthia Pazos sold her company to Respondent AdaptHealth LLC. That sale was executed through an agreement that allowed the parties to dispute certain post-closing calculations. One such dispute arose, and the agreement's resolution procedures were invoked.

Pursuant to those procedures, an independent accountant was tasked with resolving the parties' post-closing calculations dispute. The agreement's provisions state that the independent accountant's determination is final and binding upon the parties, absent manifest error.

Ms. Pazos objected to the independent accountant's determination. She says that the independent accountant committed manifest errors. Ms. Pazos initially identified several manifest errors she says the independent accountant committed. She has brought four of them to the Court for review.

After both parties filed dispositive motions, the Court requested limited discovery to better understand the independent accountant's determination and the Court's scope of review. With that limited discovery complete, the record is now clear; the independent accountant committed no manifest errors. And despite Ms. Pazos's repeated asks to do so, the Court won't otherwise interfere with the independent accountant's contracted-for authority to resolve the parties' dispute using its own substitute accountancy.

Accordingly, and for the reasons further explained now, AdaptHealth's

Motion to Dismiss is **GRANTED**, and Ms. Pazos's Motion for Summary Judgment is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Petitioner Cynthia Pazos is the founder and former chief executive officer of Diabetes Management and Supplies, LLC ("DMS") and a Louisiana resident.[1] DMS was a provider of diabetes products and services, including testing supplies and insulin pumps.[2]

Respondent AdaptHealth LLC is a Delaware limited liability company.[3] AdaptHealth operates a national network of medical equipment companies that provide products and services to outside-hospital patients.[4]

### B. THE AGREEMENT

Ms. Pazos sold DMS to AdaptHealth via a Membership Interest Purchase Agreement (the "MIPA") executed on December 31, 2020.[5]

The MIPA included certain post-closing purchase price adjustment calculations.[6] Under its section 2.4, DMS was required to deliver a certificate at

---

[1] Verified Petition to Vacate Expert Report ("Pet.") ¶ 12 (D.I. 1).

[2] *Id*. ¶ 14.

[3] *Id*. ¶ 13.

[4] *Id*.

[5] *Id*. ¶ 17.

[6] *Id*. ¶ 18; *id*., Ex. A ("MIPA") § 2.4.

Closing "setting forth the Estimated Closing Cash Amount and the Estimated Closing Working Capital."[7] AdaptHealth would then prepare and deliver to Ms. Pazos, within 90 days of closing and "in accordance with the Accounting Principles," "a consolidated balance sheet of the Company and the Subsidiary as of the Closing Date (without giving effect to the Transactions) and a statement (the "Closing Date Statement") . . . ."[8]

The MIPA then provides dispute resolution provisions for disagreements about the Closing Date Statement.[9] Under those provisions, Ms. Pazos had 30 days to review the Closing Date Statement provided by AdaptHealth and the ability to object.[10] If the parties couldn't resolve an objection themselves, section 2.4(b)(iii) describes what happens next:

> Resolution of Disputes. If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the 30 calendar days after delivery of the Statement of Objections, then any amounts remaining in dispute ("Disputed Amounts") shall be submitted for resolution to an impartial nationally recognized firm of independent certified public accountants as the Parties shall mutually agree (an "Independent Accountant") who, acting as experts and not arbitrators and making all calculations in accordance with the Accounting Principles, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Date Statement.[11]

---

[7]   MIPA § 2.4(a).

[8]   *Id*. (underlining in original).

[9]   *Id*. § 2.4(b).

[10]  *Id*. §§ 2.4(b)(i)-(ii).

[11]  *Id*. § 2.4(b)(iii) (underlining in original).

Section 2.4(b)(iii) further states that:

> The Independent Accountant's determination shall be final and binding on the Parties and shall not be subject to appeal or further review absent manifest error. In resolving any disputed item, the Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party. The Independent Accountant shall determine and include in its report an award of the costs of its review and report based on the extent to which the Parties prevail in such matter.[12]

"Accounting Principles" is defined in the MIPA as,

> those accounting methods, practices, principles, policies and procedures, together with those classifications, judgments and valuation and estimation methodologies, used in the preparation of the Illustrative Working Capital Calculation, in each case, to the extent consistent with GAAP . . . .[13]

The "Illustrative Working Capital Calculation" is attached as Exhibit B to the MIPA.[14]  It provides calculations of DMS's current assets and current liabilities.[15]  Notably, unbilled pump receivables is not included as a line item on the attached Illustrative Working Capital Calculation.[16]

## C. THE DISPUTE

In April 2021, AdaptHealth emailed Ms. Pazos its Closing Date Statement.[17]

---

[12]  *Id.*

[13]  *Id.* § 1.1 (Definitions).

[14]  *Id.*, Ex. B (Illustrative Working Capital Calculation).

[15]  *See id.*

[16]  *See id.*

[17]  Pet. ¶ 18.

Ms. Pazos objected to that statement, taking issue with AdaptHealth's purported exclusion of unbilled pump receivables from the Working Capital calculation as well as AdaptHealth's inventory obsolescence figure.[18] The parties then invoked the dispute resolution procedures outlined in MIPA Section 2.4(b)(iii).[19] Unable to resolve the dispute, the parties selected CohnReznick LLP as the "Independent Accountant" contemplated by the MIPA.[20]

Both parties submitted opening statements to the Independent Accountant.[21] As an exhibit to her opening statement, Ms. Pazos attached correspondence from December 29 and 30, 2020 (the "December Correspondence").[22] The December Correspondence contained a back-and-forth between AdaptHealth and Ms. Pazos's counsel with Illustrative Working Capital Calculation drafts.[23] AdaptHealth attached to its opening statement a worksheet by Elliot Davis LLC (the "Worksheet").[24] Both parties then served rebuttal statements to the other sides' arguments.[25] Next, the Independent Accountant asked both parties questions about the specifics of the dispute, the parties' interpretations of the term "Accounting Principles," and

---

[18] *Id*. ¶¶ 19, 25; *see id*., Ex. G (Statement of Objections) (D.I. 4).

[19] Pet. ¶ 22; *see* MIPA § 2.4(b)(iii).

[20] Pet. ¶ 22.

[21] *Id*. ¶¶ 25, 32.

[22] *See generally id*., Ex. H ("December Correspondence") (D.I. 5).

[23] *Id*.

[24] *See generally* Pet., Ex. I ("Worksheet").

[25] Pet. ¶ 33.

questions about the Illustrative Working Capital Computation.[26]

In February 2022, the Independent Accountant issued its report resolving the dispute (the "Independent Accountant's Report").[27] The Independent Accountant determined that the unbilled pump receivables should not be included in the Closing Working Capital, and that the parties agreed to a 2.1 percent inventory obsolescence reserve.[28] The Independent Accountant's Report further stated that it considered "all information and documentation provided by both parties," and the "relevant accounting standards governing the Disputed Amounts, as well as the nature, completeness, and accuracy of the support provided by the parties."[29] The Independent Accountant's Report attached the Worksheet as Exhibit A.[30]

Ms. Pazos requested reconsideration and clarification of the expert's determination.[31] She complained of five allegedly manifest errors she believed the Independent Accountant committed.[32] The Independent Accountant responded to that reconsideration request (the "March Response Letter") by informing Ms. Pazos that it had reviewed its original report and the parties' papers and determined that it

---

[26] *Id.* ¶ 34.

[27] *Id.* ¶ 36; *id.*, Ex. B ("Independent Accountant's Report").

[28] Independent Accountant's Report at 4-6.

[29] *Id.* at 2.

[30] *Id.*, Ex. A (Illustrative Working Capital Calculation).

[31] Pet. ¶ 44; *id.*, Ex. C ("Pazos's Reconsideration Request").

[32] Pazos's Reconsideration Request at 2-6.

did not commit any manifest errors.[33]  Dissatisfied, Ms. Pazos brought this lawsuit.[34]

## D. PROCEDURAL BACKGROUND

This action came to the Superior Court by way of a 10 *Del. C.* § 1902 transfer.[35]  Ms. Pazos's petition brings one count requesting declaratory judgment that the Independent Accountant's Report constitutes manifest error.[36]

AdaptHealth has moved to dismiss the petition.[37]  Ms. Pazos opposes AdaptHealth's motion and has cross-moved for summary judgment.[38]  AdaptHealth responded to Ms. Pazos's cross-motion by asking for Rule 56(f) discovery.[39]

The Court heard argument on the parties' cross-motions.[40]  At that hearing the Court ordered limited discovery from the Independent Accountant to answer two

---

[33]  Pet. ¶ 45; *id*., Ex. D ("March Response Letter").  The Independent Accountant did note that it committed an "oversight" by failing to provide an amount for total fees and expenses for its services; those fees and expenses, it said, added up to $44,550. March Response Letter at 2.

[34]  Pet. ¶ 48.

[35]  The Court of Chancery, where this action was initially filed, raised *sua sponte* the issue of subject matter jurisdiction. C.A. No. 2022-0362-MTZ ("Chancery Action"), D.I. 43.  That Court asked the parties to confer on a supplemental briefing schedule and brief the issue. *Id*.  Instead, the parties asked the Court of Chancery to transfer the action to this Court under 10 *Del. C.* § 1902. Chancery Action, D.I. 44.  The Court of Chancery granted that request. Chancery Action, D.I. 45.

[36]  Pet. ¶¶ 49-52.

[37]  *See generally* Respondent AdaptHealth, LLC's Opening Brief in Support of Motion to Dismiss the Verified Petition ("AdaptHealth's Mot. to Dismiss") (D.I. 16).

[38]  *See generally* Petitioner's Combined Opening Brief in Support her Motion for Summary Judgment and Answering Brief in Opposition to Respondent's Motion to Dismiss ("Pazos's Mot. for Summ. J.") (D.I. 12).

[39]  *See generally* Respondent AdaptHealth's Motion For Discovery Pursuant to Superior Court Rule 56(f) (D.I. 18).

[40]  D.I. 30.

narrow questions: (1) Did the Independent Accountant actually consider the December 20th correspondence and what weight did it give it, if any; and (2) did the Independent Accountant consider the Worksheet as a parties' agreed-upon document, or as one piece of evidence that it weighed against counterevidence as to the intent of the parties.[41] The Court also asked the parties to file supplemental briefing in light of the further record developed.[42] As part of that briefing, the Court asked the parties to address the Delaware Supreme Court's recent decision in *Terrell v. Kiromic Biopharma, Inc.*, and its effect on this case.[43]

The Independent Accountant was deposed,[44] and both parties filed their supplemental briefs shortly thereafter.[45] The Court has heard argument from the parties on the supplemented record[46] and the motions are now ripe for decision.

---

[41] D.I. 31 ("July 20, 2023 Hr'g Tr.") at 67-68.

[42] *Id*. at 69-70.

[43] *Id*. at 70.

[44] D.I. 33; *see generally* Letter to the Hon. Paul R. Wallace providing supplemental briefing ("AdaptHealth's Supp. Br."), Ex. 1 ("Independent Accountant Dep. Tr.") (D.I. 39).

[45] *See generally* AdaptHealth's Supp. Br.; Petitioner's Supplemental Brief in Further Support of Her Motion for Summary Judgment ("Pazos's Supp. Br.") (D.I. 40).

[46] D.I. 43.

## II. STANDARD OF REVIEW[47]

Summary judgment is warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[48]

Thus, on the issue raised, the burden is on the moving party to demonstrate its prayer for summary judgment is supported by undisputed facts or an otherwise adequate factual record to support a legal judgment.[49] "If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder."[50]

---

[47] As just discussed, the Court granted limited discovery into the Independent Accountant's Report. *See* July 20, 2023 Hr'g Tr. at 67-68. To resolve these motions, the Court must now look outside the pleadings and evaluate that offered through the Independent Accountant's deposition transcript. So, the Court is treating AdaptHealth's Civil Rule 12(b)(6) motion to dismiss as a motion for summary judgment and considering it under a Civil Rule 56 analysis. *See* Del. Super. Ct. Civ. R. 12(b):

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleadings to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The conversion of AdaptHealth's motion was made clear to the parties during the first hearing, when the Court granted limited discovery and requested supplemental briefing. *See* July 20, 2023 Hr'g Tr. at 68-74; *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1288 (Del. 2007) ("Before a motion to dismiss may be converted to one for summary judgment, parties must be given adequate notice and a reasonable opportunity to present pertinent material.").

[48] Del. Super. Ct. Civ. R. 56(c).

[49] *See CNH Indus. Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 3863225, at *1 (Del. Super. Ct. June 8, 2015).

[50] *Id.*

The Court may grant a motion for summary judgment when: "(1) the record establishes that, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact, and (2) in light of the relevant law and those facts, the moving party is legally entitled to judgment."[51] The Court cannot grant a motion for summary judgment "[i]f . . . the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record . . . ."[52] But, at bottom, a claim "should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary."[53]

These well-established standards and rules for summary judgment apply in full when the parties have filed cross-motions for summary judgment.[54] Cross-motions for summary judgment certainly "are not *per se*" concessions that no material factual disputes exist.[55] But, where cross-motions for summary judgment are filed and neither party argues the existence of a lingering genuine issue of

---

[51] *Haft v. Haft*, 671 A.2d 413, 414-15 (Del. Ch. 1995) (citing *Burkhart v. Davies*, 602 A.2d 56, 58-59 (Del. 1991)); *see also Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. 1996) ("If the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated his entitlement to judgment as a matter of law, then summary judgment is appropriate.").

[52] *CNH Indus. Am. LLC*, 2015 WL 3863225, at *1.

[53] *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999).

[54] *Radulski v. Liberty Mutual Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020) (listing cases).

[55] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

material fact, the Court deems the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with them.[56]

### III. PARTIES' CONTENTIONS

AdaptHealth moves for judgment in whole on Ms. Pazos's petition.[57] AdaptHealth first says that the Federal Arbitration Act governs the Court's review.[58] AdaptHealth rests its arbitration argument on the terms "final and binding" and "manifest error," and points to *Viacom International, Inc. v. Winshall*[59] for support.[60] AdaptHealth then contends that the Independent Accountant's decision should not be disturbed, as there were no manifest errors.[61] AdaptHealth specifies that the Independent Accountant's methodologies are unreviewable substantive conclusions, and that the December Correspondence does not reflect the parties' shared intent.[62]

Ms. Pazos opposes AdaptHealth's motion and moves for summary judgment in her favor.[63] In her single-count petition for declaratory judgment, Ms. Pazos says

---

[56] *Radulski*, 2020 WL 8676027, at *4; Del. Super. Ct. Civ. R. 56(h).

[57] *See generally* AdaptHealth's Mot. to Dismiss.

[58] *Id*. at 14-16.

[59] 2012 WL 3249620, at *11 (Del. Ch. Aug. 9, 2012).

[60] AdaptHealth's Mot. to Dismiss at 14.

[61] *Id*. at 14-21; Respondent AdaptHealth, LLC's Combined Answering Brief in Opposition to Petitioner's Motion For Summary Judgment and Reply Brief in Support of Respondent's Motion to Dismiss the Verified Petition ("AdaptHealth's Answering Br.") at 7-20 (D.I. 17).

[62] AdaptHealth's Mot. to Dismiss at 16-17; AdaptHealth's Answering Br. at 14-15.

[63] *See generally* Pazos's Mot. for Summ. J.

that the Independent Accountant committed "several" manifest errors.[64] Ms. Pazos's

summary judgment motion narrows those alleged errors down to four:

1) Ignoring the contemporaneous communications between the parties manifesting their shared intent regarding unbilled pump receivables;[65]

2) Rather than considering the parties' agreement, improperly relying on the Worksheet prepared solely by AdaptHealth;[66]

3) Improperly relying on the same Worksheet to incorrectly determine the inventory obsolescence dispute;[67] and,

4) Failing to make an award of costs are required by the MIPA.[68]

Ms. Pazos also says that the Independent Accountant provision is not an arbitration

provision, so the Federal Arbitration Act doesn't apply.[69] Ms. Pazos rests her non-

arbitration argument on the term "experts not arbitrators" and points to *Chicago*

*Bridge & Iron Company N.V. v. Westinghouse Electric Company LLC*[70] for support.[71]

## IV. DISCUSSION

### A. MIPA Section 2.4(b)(iii) is an "Expert Determination" Provision, not an Arbitration Provision.

As a threshold matter, the parties dispute whether MIPA Section 2.4(b)(iii) is

---

[64] Pet. ¶¶ 49-52.

[65] Pazos's Mot. for Summ. J. at 29-32.

[66] *Id*. at 32-35.

[67] *Id*. at 35-38.

[68] *Id*. at 38.

[69] *Id*. at 23-27.

[70] 166 A.3d 912, 916 (Del. 2017).

[71] Pazos's Mot. for Summ. J. at 23-25.

an arbitration provision subject to the Federal Arbitration Act, or an expert determination provision.

Last year, our Supreme Court in *Terrell v. Kiromic Biopharma, Inc.* addressed the distinction between an arbitration and an expert determination provision.[72] There, the Supreme Court endorsed the approach taken by the Court of Chancery in *Penton Business Media Holdings, LLC v. Informa PLC*[73] for addressing whether a dispute resolution provision calls for one or the other.[74] In *Penton Business*, the court explained that "the fundamental difference between an expert determination and arbitration can be found in the type and scope of authority that is being delegated by the parties to the decision maker."[75] With an expert determination, the contractual provision grants limited authority to the expert to decide "a specific factual dispute concerning a matter within the special expertise of the decision maker," for instance valuation.[76] To the *Penton Business* court, the use of the term "expert not arbitrator" signaled a "clear intent" by the parties that the provision called for an expert determination.[77]

---

[72] *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 617-19 (Del. 2023).

[73] 252 A.3d 445 (Del. Ch. 2018).

[74] *Terrell*, 297 A.3d at 617-19.

[75] *Penton Bus. Media Holdings, LLC*, 252 A.3d at 464 (citing N.Y.C. BAR COMM. ON INT'L COMMERCIAL ARBITRATION, PURCHASE PRICE ADJUSTMENT CLAUSES AND EXPERT DETERMINATIONS: LEGAL ISSUES, PRACTICAL PROBLEMS AND SUGGESTED IMPROVEMENTS 4 (2013)).

[76] *Id.*

[77] *Id.* at 465.

Following *Terrell* and *Penton Business*, Delaware courts have applied the "authority test" to determine whether parties have opted for arbitration.[78] "The test turns primarily on the degree of authority delegated to the decision-maker."[79] In a plenary arbitration, the arbitrator has "authority to decide all legal and factual issues necessary to resolve the matter."[80] By contrast, an expert determination is typically limited "to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker."[81]

MIPA Section 2.4(b)(iii) is what's often referred to as an Accountant True-Up Mechanism.[82] "Generally speaking, an Accountant True-Up Mechanism does not involve arbitration under the FAA; it calls for an expert determination."[83]

The Accountant True-Up Mechanism employed here is no different. It is

---

[78] *See ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 993-95 (Del. Ch. 2023); *Paul v. Rockpoint Grp., LLC*, 2024 WL 89643, at *10 (Del. Ch. Jan. 9, 2024); *Cedres v. Geoffrey Servs. Corp.*, 2024 WL 1435110, at *2-3 (Del. Ch. Apr. 3, 2024).

[79] *ArchKey Intermediate Holdings Inc.*, 302 A.3d at 993.

[80] *Terrell*, 297 A.3d at 618.

[81] *Id.* (and noting that factual dispute is "usually concerning an issue of valuation"); *see also Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 213 (3d Cir. 2023) ("[E]xpert-determination provisions typically limit the "'decision maker's authority to deciding a specific factual dispute within the decision maker's expertise.'" (quoting *Ray Beyond Corp. v. Trimaran Fund Mgmt., LLC*, 2019 WL 366614, at *6 (Del. Ch. Jan. 29, 2019))); *see also* Gary B. Born, *International Arbitration: Law and Practice* § 1.01[C][2] (2nd ed. 2016) ("[E]xpert determinations frequently involve narrowly-defined and circumscribed factual or technical issues, *unlike arbitral proceedings, which seek to resolve broader legal disputes between the parties . . . .*" (emphasis added)).

[82] *See ArchKey Intermediate Holdings Inc.*, 302 A.3d at 981 (defining an "Accountant True-Up Mechanism" as "a post-closing price adjustment mechanism in an acquisition agreement that refers a dispute to an independent accountant.").

[83] *Id.* at 989; *see also id.* at 991-95 (explaining why an Accountant True-Up Mechanism is not an arbitration).

limited in scope and clear in its language. Specifically, the MIPA provision limits the Independent Accountant's authority solely to resolving cost adjustment disputes.[84] And, similar to the provision interpreted in *Penton Business*, MIPA Section 2.4(b)(iii) uses the phrase "experts and not arbitrators," signaling the parties' intent.[85] The phrases "manifest error" and "final and binding" do not change that intent.[86] Those phrases are oft features of an expert-determination provision.[87] Accordingly, the Federal Arbitration Act doesn't apply here. Section 2.4(b)(iii) calls for expert determination, not arbitration.[88]

---

[84] *See* MIPA § 2.4(b)(iii); *ArchKey Intermediate Holdings Inc.*, 302 A.3d at 993 ("The court must examine the nature and scope of the authority that the agreement provides.").

[85] MIPA § 2.4(b)(iii).

[86] *See ArchKey Intermediate Holdings Inc.*, 302 A.3d at 993. Indeed, a manifest error clause is oft a feature of an expert-determination provision.

[87] Clive Freedman & James Farrell, KENDALL ON EXPERT DETERMINATION §7.8-2, at 165 (5th ed. 2015) [hereinafter KENDALL ON EXPERT DETERMINATION] ("Expert determination clauses very commonly provide that the decision will be 'final and binding[,]' and it is clearly in the parties' interests that they should be so."); *id.* § 14.11-1, at 346 ("Expert determination clauses often provide that the decision is final and binding 'in the absence of manifest error'." (citation omitted)).

[88] For further support, compare *Cedres*, 2024 WL 1435110, at *2-4 (finding that the provision at issue called for arbitration because (1) the provision required the independent party to make judicial determinations of legal obligations in relation to the entire litigation, and (2) the provision provided judicial proceeding-like guidelines) with MIPA § 2.4(b)(iii) (limiting the Independent Accountant's authority to a singular fact issue and omitting judicial proceeding-like guidelines).

To the extent AdaptHealth relies on *Viacom*, there the Court of Chancery found the parties conceded that arbitration principles should be applied. 2012 WL 3249620, at *11. Accordingly, *Viacom* does nothing to assist the Court here with its threshold inquiry into whether the dispute resolution provision is an arbitration provision or an expert determination provision.

**B. THE COURT'S ROLE IN RESOLVING THIS DISPUTE IS LIMITED TO DETERMINING WHETHER "MANIFEST ERROR" OCCURRED.**

Section 2.4(b)(iii) is a contract-borne expert-determination provision. So, Delaware rules of contract interpretation and the MIPA's terms control the Court's review.[89] "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[90] And "[w]hen the contract is clear and unambiguous, [the Court] will give effect to the plain-meaning of the contract's terms and provisions."[91]

Section 2.4(b)(iii) states that "[t]he Independent Accountant's determination shall be final and binding on the Parties and shall not be subject to appeal or further review absent *manifest error*."[92]

**C. SO, WHAT IS A "MANIFEST ERROR" AND HOW MIGHT CONTRACTING PARTIES ASSIST A COURT IN MORE FACILELY DETERMINING WHETHER ONE EXISTS?**

"Manifest error" isn't defined in the MIPA. And as both the parties and Court engaged on this precise issue, it became clear there is a certain confounding paucity

---

[89] *See Penton Bus. Media Holdings, LLC*, 252 A.3d at 465-67; *see also Terrell v. Kiromic Biopharma, Inc.*, 2022 WL 175858, at *6 (Del. Ch. Jan. 20, 2022) (applying contract interpretation principles after finding the dispute resolution provision did not call for arbitration), *aff'd*, 297 A.3d at 619 ("Applying traditional principles of contract interpretation" to the at-issue dispute resolution provision).

[90] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted).

[91] *Id*. at 1159-60 (Del. 2010) (citation omitted); *see also Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Clear and unambiguous language . . . should be given its ordinary and usual meaning.").

[92] MIPA § 2.4(b)(iii) (emphasis added).

of Delaware authority thereon. That said, one authoritative English law treatise on expert determinations[93] is oft-cited[94] and illuminating here as it speaks directly—of and in the very same language[95]—to the questions the Court must resolve.

Therein, the term "manifest error" as used in an expert-determination provision is explained thusly:

> A manifest error has been referred to as a "plain and obvious error[,]" or an error which is "obvious or easily demonstrable without extensive investigation[.]"[96]

Too, "manifest error" should be "confined to errors which are obviously capable of affecting the [determination] . . . ."[97] This construct aligns well with the American understanding of "manifest error"[98]—as well as Delaware's in similar context.[99]

---

[93] KENDALL ON EXPERT DETERMINATION, *supra*.

[94] *E.g.*, *Sapp*, 75 F.4th at 211; *Paul v. Rockpoint Grp., LLC*, 2024 WL 89643, at *10-11 (Del. Ch. Jan. 9, 2024); *ArchKey Intermediate Holdings Inc.*, *supra*; *Penton Bus. Media Holdings, LLC*, *supra*.

[95] *See* KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11, at 346-48 (discussing the use of the contractual phrase "in the absence of manifest error").

[96] *Id.* § 14.11-2, at 347; *see also id.* (quoting one commentator's observation that: "All errors are manifest when discovered; but such clauses . . . are intended to be confined to oversights and blunders so obvious as to admit of no difference of opinion.").

[97] *Id.* § 14.11-4, at 348.

[98] *See, e.g.*, *Tenenbaum Living Tr. v. GCDI S.A.*, 682 F.Supp.3d 342, 352-55 (S.D.N.Y 2023) (explaining meaning of "manifest error" under New York law); *Hall Ponderosa, LLC v. State Through La. State Land Off.*, 345 So.3d 537, 548 (La. Ct. App. 2022) (instructing that when applied in an appeal of a judicial determination: "To reverse a fact-finder's determination under the manifest error standard, an appellate court must engage in a two part-inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact, and (2) the court must further determine that the record establishes a finding that is clearly wrong." (citation omitted)).

[99] "'[M]anifest error' . . . is most sensibly understood as a corollary to 'evident material mistake.'" *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2019 WL 1233458, at *2 (Del. Ch. Feb. 18, 2019)

- 17 -

Now, "[t]he error need not be manifest at the time the decision is made, but may become manifest as a result of subsequent investigation . . . ."[100] To be sure though, the Court's review in deciding whether "manifest error" exists is by design meant to be limited.[101]

The Court will apply that formulation here. Thus, the Independent Accountant only committed manifest error if it made a plain and obvious error, and the record demonstrates strong reliance on that error.

Beyond determining whether manifest error has occurred, the MIPA does not spell out a specific role for the Court in any "appeal or further review." But it does spell out the role of the Independent Accountant, providing the Independent Accountant with specific parameters.[102] So, while the Independent Accountant is

---

(citing 9 U.S.C. § 11 and quoting *Viacom*, 2012 WL 3249620, at *11 n.80). And, "[r]egarding evident material mistake, federal courts have held that 'where the record that was before the arbitrator demonstrates an unambiguous and undisputed mistake of fact and the record demonstrates strong reliance on that mistake by the arbitrator in making his award, vacation or modification may be proper.'" *Id*. at *1 (cleaned up) (quoting *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 214 (5th Cir. 1993)).

[100] KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11-2, at 347 (citation omitted).

[101] *Tenenbaum Living Tr.*, 682 F.Supp.3d at 354-55 (discussing the scope of the court's review for "manifest error").

[102] MIPA § 2.4(b)(iii) states:

> In resolving any disputed item, the Independent Accountant may not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party. The Independent Accountant shall determine and include in its report an award of the costs of its review and report based on the extent to which the Parties prevail in such matter. By way of illustration, if the items in dispute total in amount to $1,000 and the Independent Accountant awards $600 in favor of Seller's position, 60% of the costs of its review would be borne by Buyer and 40% of the costs would be borne by

afforded a broader role in resolving Cost Adjustment Statement disputes, the Court's role is limited only to deciding if the "manifest error" infected the expert's determination.[103]

It is now beyond debate that ADR processes have an important and salutary purpose in the resolution of disputes of this type.[104]  And their inclusion by contracting parties in the ordering of the parties' business relationship has been honored by Delaware's courts.  But those provisions, either by fiat or contractual

---

Seller. Buyer and Seller shall make available to the Independent Accountant all relevant books and records relating to the calculations submitted and all other information reasonably requested by the Independent Accountant.

[103] *See Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997))); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 445 (Del. 2005) (Ridgley, J., concurring in part, dissenting in part) ("courts should not rewrite contracts" (citing *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983))).

Ms. Pazos says that the Independent Accountant's "errors are so significant and plain that no accounting knowledge or experience is required to appreciate them . . . ." Pazos's Mot. for Summ. J. at 46.  According to Ms. Pazos, the Court can simply re-calculate and enter judgment. *See id.* While it might be more efficient, the Court cannot substitute its own decision-making for that of the expert where the parties specifically bound themselves by contract for the use of an expert to settle disputes.  The Court's role is limited here to determining whether manifest errors occurred— not determining the post-closing payment calculations themselves. *See Tenenbaum Living Tr.*, 682 F.Supp.3d at 355 ("A manifest error clause avoids [the peril of a court's erroneous financial computations] by requiring courts not to make such determinations themselves but rather to defer to qualified experts selected by the parties."); *id.* ("for manifest error clauses to properly serve their function, they must preclude courts from reexamining the substantive correctness of the determination to which the clause applies").

[104] *See ArchKey Intermediate Holdings Inc.*, 302 A.3d at 990 ("At the other end of the ADR spectrum is an expert determination, which provides parties with a quick and relatively inexpensive answer on an issue that calls for informed judgment.").

design[105]—as is the case here—are now with some regularity subject to judicial review.

The scope of that review and what should be expected of an expert when carrying out her role was the subject of some spirited discussion here. As our Court of Chancery has explained, much of that is (and should) be defined by the contract terms and engagement of the expert.[106] For its part, the Court should usually be able to make its manifest-error decision by considering the reasons expressed for the expert's determination (which might include some clarification of those reasons), "documents which are expressly referred to in the determination and form an essential part of the determination (such as the agreement between the parties), the submissions of the parties which are referred to in the reasons," and the easily discernable facts.[107]

When an expert is called to duty under an express provision that her product might be subject "to appeal or further review" by a court for "manifest error," it seems sensible that the parties—either in the contract itself or the joint engagement—define the expected breadth and depth of the expert's reporting. If they are serious about the full utility of this dispute resolution instrument, there is

---

[105] *Id.* ("Unless the contract specifies, an expert determination is not reviewable by a court.").

[106] *See Penton Bus. Media Holdings, LLC*, 252 A.3d at 465-69; *see also Terrell*, 297 A.3d at 617-19.

[107] KENDALL ON EXPERT DETERMINATION, *supra*, § 14.11-3, at 347-48 (citations omitted).

little burden, but every incentive, for each of the engaging parties to ensure they obtain an adequate report.[108] Regretfully, that didn't happen here; further clarification and limited discovery became necessary. And that is just antithetical to the "simple, informal, and contract-based" process expert-determinations are supposed to be.[109]

With this backdrop, the Court now determines whether what Ms. Pazos posits as manifest errors truly are.

## C. THE INDEPENDENT ACCOUNTANT DID NOT MAKE MANIFEST ERRORS.

Ms. Pazos says the Independent Accountant made four manifest errors.[110] Of those, the fourth was reconciled already and warrants no further examination.[111] The other three may be disposed of now.

---

[108] *Id.* at 348 (observing that when the expert doesn't adequately set out the reasons for the determination "it may be impossible to show that an error is manifest or a mistake is obvious, and therefore the provision may be of limited assistance"). When initiating the expert-determination process neither party can be sure on which side the determination will fall. But they should be mindful that a court will always be resistant to affording advantage to a party that benefits from an under-explained determination.

[109] *Id.* § 1.1-1, at 1.

[110] Pet. ¶ 51; Pazos's Mot. for Summ. J. at 43-44.

[111] Ms. Pazos's fourth alleged manifest error is that the Independent Accountant failed to include the requisite award of costs in its report. Pazos's Mot. for Summ. J. at 38-39, 44. But Ms. Pazos admits that the Independent Accountant acknowledged that mistake and fixed it in the March Response Letter. *Id.* at 38. Ms. Pazos does not actually argue that the 'award of costs' failure was a manifest error in itself. Instead, she says that the Independent Accountant's "fail[ure] to understand its obligations under the Agreement or to comply with its plain obligations was indicative of the other manifest errors identified." *Id.* As such, Ms. Pazos's purported fourth manifest error has already failed.

### 1. Ms. Pazos's First Alleged Manifest Error

Ms. Pazos first argues that the Independent Accountant made a manifest error by "stopping its analysis with a cursory examination of the face of the final Illustrative Working Capital Calculation"[112] and "ignoring the contemporaneous communications between the parties manifesting their shared intent regarding the unbilled pump receivables."[113] Specifically, Ms. Pazos says the Independent Accountant "improperly exclud[ed] unbilled pump receivables from the working capital" even though the December Correspondence between the parties showed that the parties agreed to include unbilled pump receivables in the working capital.[114]

AdaptHealth counters that the Independent Accountant considered the unbilled pump receivables, examined the December Correspondence, and actively addressed this issue in the March Response Letter.[115] Second, AdaptHealth says the Independent Accountant was not required to present a full analysis as part of its report.[116] Third, AdaptHealth says the December Correspondence doesn't reflect the parties' shared intentions.[117] And fourth, AdaptHealth says the Illustrative Working Capital Calculation determination is a methodology that can't form the basis for

---

[112] Pet. ¶ 38.

[113] Pazos's Mot. for Summ. J. at 29 (cleaned up).

[114] *Id*. at 29-32 (citing December Correspondence).

[115] AdaptHealth's Answering Br. at 9-11.

[116] *Id*. at 11-13.

[117] *Id*. at 14.

manifest error.[118]

In its report, the Independent Accountant said that it "considered all information and documentation provided by both parties (excluding the surrebuttal as discussed above), including the Purchase Agreement itself."[119] The Independent Accountant reiterated in its March Response Letter that it considered all the documents submitted.[120] And when deposed during the limited discovery period, the Independent Accountant repeatedly stated that it considered the December Correspondence in relation to the Illustrative Working Capital Calculation and then made its determination on the parties' intended inclusions.[121]

The Court's role here is limited to determining whether a plain and obvious error occurred and whether the record demonstrates a strong reliance on that error.[122] The supposed mistake appears to be that the Independent Accountant didn't consider a correspondence indicative of the parties' intent to include unbilled pump receivables in the Illustrative Working Capital Calculation. But the now-clear record indicates that the Independent Accountant *did* consider the December

---

[118] *Id.*

[119] Independent Accountant's Report at 2. The Independent Accountant's Report also said "its determination is based solely upon the terms and conditions of the Purchase Agreement." *Id*. at 1. But it appears this was a misstatement, since the Independent Accountant's Report specifically refers to documents besides the MIPA. *See id*., Ex. A (Illustrative Working Capital Calculation).

[120] March Response Letter at 3.

[121] *See, e.g.*, Independent Accountant Dep. Tr. at 65-72.

[122] *See* Part IV(B), *supra*.

Correspondence. And the determination of unbilled pump receivables' inclusion or exclusion was well within the Independent Accountant's authority under the parties' accountant true-up mechanism.[123] Thus, Ms. Pazos's first allegation of manifest error fails.

### 2. Ms. Pazos's Second Alleged Manifest Error

Ms. Pazos next argues that the Independent Accountant made a manifest error by "improperly relying on the Worksheet prepared solely by AdaptHealth," "rather than considering the parties' agreement."[124]

Specifically, Ms. Pazos says that the Independent Accountant "compounded its errors by relying instead on the Worksheet—a document that [the Independent Accountant] fundamentally misunderstood and, as a result, completely misapplied."[125] Ms. Pazos insists that purported misunderstanding is manifest because the Independent Accountant "referred to the Worksheet as 'the spreadsheet that the parties employed to calculate the [I]llustrative Working Capital [Calculation],' and assumed that the Worksheet 'was based on the Company's

---

[123] *See ArchKey Intermediate Holdings Inc.*, 302 A.3d at 997-98 (quoting KENDALL ON EXPERT DETERMINATION's observation that "[i]t may be necessary for the expert, in order to decide the point which has been referred to him, to decide a disputed point of interpretation of the contract between the parties" and "[t]he more closely related the term or provision is to the expert's area of expertise, the more likely it is that an expert can interpret the term without judicial assistance.").

[124] Pazos's Mot. for Summ. J. at 32 (cleaned up). The agreement referenced here is the December Correspondence.

[125] *Id.*

financial statements, which were prepared in accordance with the tax basis of accounting.'"[126] When in reality, the Worksheet was prepared by AdaptHealth's advisor, Elliott Davis LLC.[127]

In its March Response Letter, the Independent Accountant stated that "we found that the Buyer and Seller clearly agreed to exclude [unbilled pump receivables] from the Working Capital Calculation" and "it bears noting that the Seller did not object to our reliance of Exhibit A."[128]

The Court ordered the Independent Accountant be deposed on this issue of whether it considered the Worksheet as an agreed-upon document between the parties, or as a piece of counterevidence as to the parties' intent on including unbilled pump receivables in the Illustrative Working Capital Calculation. During that deposition, the Independent Accountant confirmed its knowledge that the Worksheet was prepared by only one of the parties.[129] Yet, the Worksheet's numbers lined up with the Independent Accountant's *own* analysis of "the company's books and records," as well as with numbers that were "used by [Ms. Pazos's] own financial advisors in doing its own quality of earnings analysis."[130] So, the Independent

---

[126] *Id*. at 33 (quoting Independent Accountant's Report at 3).

[127] *Id*. at 32-33.

[128] March Response Letter at 4.

[129] Independent Accountant Dep. Tr. at 73-77, 135.

[130] *Id*. at 77, 133.

Accountant concluded that the Worksheet was representative of the parties' intent when creating the Illustrative Working Capital Calculation.[131]

The ability to credit and weigh documents one way or another is within the province of this expert.[132] The Independent Accountant did just that. The Court cannot substitute its judgment or analysis, it can only determine whether there was a plain and obvious error.[133] There was not. Ms. Pazos's second alleged manifest error falls short.

### 3. Ms. Pazos's Third Alleged Manifest Error

Last, Ms. Pazos argues that the Independent Accountant made a manifest error by "improperly relying on the same Worksheet to incorrectly determine the inventory obsolescence dispute."[134] Ms. Pazos says the Independent Accountant committed a manifest error regarding the inventory obsolescence amount by (1) "assum[ing] that the parties jointly prepared the Worksheet" and (2) failing to explain or address "how the parties calculated the purportedly agreed-upon reserve,

---

[131] *See id*. at 74-75; *see also id*. at 81 ("As the numbers reconcile to [the Illustrative Working Capital Calculation], I believe that the worksheet, as you refer to it, was prepared prior to the signing of the purchase agreement.").

[132] *See* MIPA § 2.4(b)(iii); Part IV(B), *supra*.

[133] *See CLP Toxicology, Inc.*, 2019 WL 1233458, at *1 (which might take the form of "an unambiguous and undisputed mistake of fact"); *see also Tenenbaum Living Tr.*, 682 F.Supp.3d at 355 (noting that proper employment of a manifest error clause "requir[es] courts not to make such determinations themselves but rather to defer to qualified experts selected by the parties").

[134] Pazos's Mot. for Summ. J. at 35 (cleaned up).

or whether any agreed-upon figure deviated from month to month."[135]

In its report, the Independent Accountant found that "[c]learly, the parties agreed to a 2.1% inventory obsolescence reserve to calculate the Illustrative Working Capital."[136] The Independent Accountant did not further explain why it believed the parties agreed to that percentage. And this issue is not addressed in the March Response Letter.

But, again, the Independent Accountant did not make a plain and obvious error. Instead, the Independent Accountant decided to credit and discredit certain documents as it saw fit. Such balancing decisions are within the Independent Accountant's contracted-for authority.[137] The Court won't overstep its bounds.[138] Ms. Pazos loses on her third alleged manifest error claim too.

## V. CONCLUSION

Ms. Pazos has failed to show that the Independent Accountant committed any manifest errors. Acting as an expert, the Independent Accountant weighed various documents, conducted an analysis using its subject expertise, and reached a conclusion about the parties' intended inclusion. That's what these parties agreed

---

[135] *Id*. at 36-37.

[136] Independent Accountant's Report at 6.

[137] *See* MIPA § 2.4(b)(iii).

[138] *See ArchKey Intermediate Holdings Inc.*, 302 A.3d at 990; *see also Tenenbaum Living Tr.*, 682 F.Supp.3d at 355 ("for manifest error clauses to properly serve their function, they must preclude courts from reexamining the substantive correctness of the determination to which the clause applies").

for this expert to do.  And beyond review on manifest error grounds, the Court cannot, and will not, insert its own judgment or analysis into the agreed-upon expert's conclusions.

Accordingly, AdaptHealth's Motion to Dismiss is **GRANTED**, and Ms. Pazos's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____
Paul R. Wallace, Judge

Original to Prothonotary

cc: All Counsel via File and Serve