**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 22-2181

———————

KEVIN B. SAPP; JAMIE HOPPER,

Appellants

v.

INDUSTRIAL ACTION SERVICES, LLC; RELADYNE,
LLC

———————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-19-cv-00912)
District Judge: Honorable Richard G. Andrews

———————

Argued April 13, 2023


Before: CHAGARES, Chief Judge, SCIRICA and AMBRO,
Circuit Judges

(Opinion filed July 20, 2023)

Maureen Farrell **(Argued)**
Adam T. Muery
Muery & Farrell
6200 La Calma Drive
Suite 100
Austin, TX  78752

               Counsel for Appellants

David J. Baldwin
Berger Harris
1105 N. Market Street
11th Floor
Wilmington, DE  19801

Irving M. Geslewitz **(Argued)**
Edward D. Shapiro
Much Law
191 N. Wacker Drive
Suite 1800
Chicago, IL  60606

               Counsel for Appellees

---

OPINION OF THIS COURT

---

AMBRO, <u>Circuit Judge</u>

Arbitration is an ever-growing trend that many parties prefer and courts routinely enforce. Yet that trend cannot continue so far that arbitration is forced on parties who never agreed to it.

That is what happened here. The parties agreed in an asset purchase agreement that certain narrow factual questions about the preparation of two forms of financial statements be sent to an accounting firm—*i.e.*, an expert in preparing financial statements. The accounting firm then had 30 days to audit the statements and send back final drafts. The parties did not label this process. They called it neither arbitration nor expert determination (two common forms of alternative dispute resolution). The accounting firm had limited authority, a narrow scope of duty, a short deadline, and no procedures for conducting discovery or accepting legal arguments. This context calls for an expert determination; thus we part from the District Court's decision compelling arbitration, vacate its entry of judgment, and remand for further proceedings consistent with this opinion.

## I. Background

### A. The Asset Purchase Agreement

Appellants Kevin Sapp and Jamie Hopper owned two companies, Industrial Action Services, Inc. and IAS Canada, Inc., which provided "advanced oil flushing, chemical cleaning and equipment cleaning for industrial equipment such as turbines, compressors, hydraulic systems[,] and process systems." Sapp Br. at 3. In 2016, Sapp and Hopper sold the companies to appellee Industrial Action Services LLC ("IAS"), a subsidiary of RelaDyne LLC created for this acquisition. An Asset Purchase Agreement ("Purchase Agreement") governed the sale. It provided that, as consideration for the sale, Sapp and Hopper would receive (1) a $12 million payment at closing, (2) $1.5 million of RelaDyne stock, (3) $3 million in deferred compensation, and (4) three potential and variable payments, called Earn Out Consideration, if IAS performed well enough over the next three years.

At issue here is the Earn Out. Per § 2.6 of the Purchase Agreement, Sapp and Hopper could earn an additional $15 million—up to $5 million in each of three twelve-month Earn Out Periods—if the post-merger company achieved certain EBITDA[1] benchmarks. The Purchase Agreement in § 2.6(c) specifies that, within 90 days of the close of an Earn Out Period, IAS had to provide Sapp and Hopper with an Earn Out

---

[1] EBITDA has a specific definition under the Purchase Agreement, but generally it stands for earnings before interest, taxes, depreciation, and amortization. *See Earnings*, Black's Law Dictionary (11th ed. 2019).

4

Statement of the EBITDA computation for that period. It became final unless, within 30 days of delivery of the Earn Out Statement, they submitted their challenges to it in writing in a document known as a "notice of disagreement."[2] The contract defines "Notice of Disagreement" elsewhere as including only "disagreements which are based on the Statement not having been prepared in accordance with this Section . . . or which are based on mathematical errors." App. 84.

If Sapp and Hopper sent such a Notice to IAS, § 2.6(d) provides that the disagreement would "be settled according to the procedures set forth in Section 2.3(e)" of the Purchase Agreement. App. 86. That provision states:

> If a Notice of Disagreement is received by Buyer in a timely manner, then the Statement (as revised in accordance with this sentence) will become final and binding upon Buyer and Sellers on the earlier of (A) the date Buyer and [Sellers] resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement, or (B) the date any disputed matters are finally resolved in writing by the Accounting Firm. During the 60-day period following the delivery of a Notice of Disagreement, Buyer and [Sellers] shall meet and work in good faith to resolve any differences that they may have with respect to the matters specified in the Notice of Disagreement. During

---

[2] The term "notice of disagreement" was not capitalized here. To the District Court, this was significant; as noted below, to us it is not.

such period, the Sellers shall give Buyer and its auditors, accountants and advisors reasonable access to all working papers and other documents of the Sellers and . . . its auditors, accountants and advisors, to the extent used in connection with the preparation of the Notice of Disagreement. At the end of such 60-day period, Buyer and the Sellers shall submit to an independent accounting firm (the "Accounting Firm") for resolution of any and all matters that remain in dispute and were properly included in the Notice of Disagreement.

The Accounting Firm will be Ernst & Young or, if such firm is unable or unwilling to act, a nationally recognized independent public accounting firm as shall be agreed upon by the parties. Buyer and the Sellers agree to use commercially reasonable good faith efforts to cause the Accounting Firm to render a decision resolving the matters submitted to the Accounting Firm within 30 days. Judgment may be entered upon the determination of the Accounting Firm in any court set forth in Section 11.6.

App. 84. Taken together, §§ 2.6(d) and 2.3(e) require that certain disputes about an Earn Out Statement be resolved by an Accounting Firm.

But §§ 2.6(d) and 2.3(e) are not the only two provisions on dispute resolution. Later in the Purchase Agreement,

6

§ 11.17 directs the parties generally to use non-binding mediation, followed by litigation if mediation fails.

## B. The Claim

IAS determined that the post-merger company did not meet its EBITDA targets for any of the three Earn Out Periods. Sapp and Hopper claim that IAS intentionally undermined the business to prevent the company from hitting the EBITDA targets, in violation of Purchase Agreement § 2.6(g), which prohibits IAS from "taking any action designed to circumvent payment of Earn Out Consideration." App. 87. They raised these concerns about potential bad-faith circumvention with IAS personnel via letters, emails, and phone conversations. Discussions to resolve the dispute failed, so Sapp and Hopper filed a lawsuit in Texas state court for breach of contract, tortious interference, and declaratory relief. IAS removed the case to the District Court for the Southern District of Texas based on diversity jurisdiction and then moved to transfer venue to the District of Delaware in line with a forum-selection provision in the Purchase Agreement. Four months after filing the suit, Sapp and Hopper filed a Notice of Disagreement under § 2.6(d) to avoid waiving any rights and sought a declaratory judgment that the claims in the lawsuit fall outside the scope of the dispute-resolution process specified in §§ 2.3(e) and 2.6(d).

IAS soon sought to compel arbitration under § 2.3(e) and stay the District Court proceeding. The District Court referred the dispute to Magistrate Judge Burke. He held oral argument and issued a Report and Recommendation ("R&R") concluding that § 2.3(e) of the Purchase Agreement calls for expert determination, not arbitration, under Delaware law. *Sapp v. Indus. Action Servs., LLC* ("*Sapp R&R*"), 2020 WL

7

1450563, at *5-6 (D. Del. Mar. 25, 2020), *objections sustained*, 2020 WL 2813176 (D. Del. May 29, 2020). As a result, Judge Burke recommended that the Court deny the motion to stay pending arbitration. *Id.* IAS objected to the R&R. The District Court granted IAS's objections and, disagreeing with the R&R, held that the Purchase Agreement contained a valid agreement to arbitrate.

## C. The Arbitration

After the District Court compelled arbitration, the parties needed to agree on which Accounting Firm would decide the dispute. Purchase Agreement § 2.3(e) designated Ernst & Young as the default firm, but it had a conflict preventing it from performing that service. The parties vetted several other nationally recognized firms before selecting EisnerAmper. They signed an engagement letter with the firm, which specifically assigned two accountants, Nelson Luis and James Agar, to work on the matter.

In December 2021, Luis and Agar (now of Eisner Advisory, following corporate restructuring at EisnerAmper) issued a decision in IAS's favor, determining that no adjustments to the EBITDA calculation were required under the Purchase Agreement and that Sapp and Hopper had no right to any Earn Out Consideration. Sapp and Hopper moved to vacate the arbitration award, and IAS opposed. The District Court denied their motion to vacate and entered judgment for IAS. They timely appealed.

8

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. Sapp and Hopper ask us to review two orders of the District Court: (1) its May 29, 2020, order staying proceedings and sending the dispute to arbitration; and (2) its May 26, 2022, order denying their motion to vacate the arbitration award and entering judgment for the defendants. As to the latter, it was a final order because it was a judgment on the merits, even though there is an unresolved fee petition still pending in the District Court. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 200 (1988) ("[A] claim for attorney's fees is not part of the merits of the action to which the fees pertain."). As to the former, it became appealable when it merged with the final order. *See R & C Oilfield Services LLC v. Am. Wind Transp. Grp. LLC*, 45 F.4th 655, 659 (3d Cir. 2022); *see also* Fed. R. App. P. 3(c)(4).

We review *de novo* the validity and enforceability of an arbitration agreement. *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 177 (3d Cir. 2010) (en banc). We apply the same standard of review as a district court, which is either that for a motion to dismiss or for summary judgment, depending on whether the court considered evidence beyond the pleadings. *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 771-774 (3d Cir. 2013). The District Court here did not discuss the standard it used, but because it declined to order discovery and considered only the pleadings in determining whether the parties agreed to arbitrate, we apply the motion-to-dismiss standard. In the arbitrability context, this means "we look to the complaint and the documents on which it relies and will compel arbitration only if it is clear, when read in the light most favorable to the respondents, that the parties agreed to

arbitrate." *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 325 (3d Cir. 2022).

III.    **Analysis**

> **A. Arbitration and expert determination are different forms of dispute resolution.**

Arbitration and expert determination, in most states, are two distinct forms of private alternative dispute resolution that produce binding results. *See* John Kendall, Clive Freedman, & James Farrell, Expert Determination 1.1 (5th ed. Apr. 2015). They have similarities, leading some commentators to call them "close cousins" and some courts struggling to apply the differences between them. *See* Committee on International Commercial Disputes of the Association of the Bar of the City of New York, Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements ("City of New York Bar Report"), at 14 (June 2013). Despite these similarities, "the fundamental difference" between the two methods is "the type and scope of authority that is being delegated by the parties to the decision maker." *Id.* at 4.

On the one hand, arbitration occurs when "the parties . . . intend[] to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter." *Id.* at 15. The arbitrator functions like "a judge in a judicial proceeding." *Id.* For example, like a judge, the arbitrator "cannot meet with either party alone" and must afford parties the due process protections of adversarial proceedings. *See* Practical Law Litigation, *ADR Mechanisms in the US: Overview* (2023); City of New York Bar Report at

10

5. After resolving all factual and legal questions in a formal process that mirrors a judicial proceeding, the arbitrator can award a legal remedy, "such as damages or injunctive relief," that courts will enforce. City of New York Bar Report at 4.

By contrast, experts decide narrower issues using a less formal process. Under this method, the parties appoint a person or entity with specialized knowledge, "usually of a technical nature," to determine a confined issue. Practical Law Litigation, *ADR Mechanisms in the US: Overview* (2023). The authority of an expert "is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact" and does not extend to making "binding decisions on issues of law or legal claims." City of New York Bar Report at 4. It makes its decision without following court-like procedures: there are usually no pleadings, evidentiary hearings, or the taking of witness testimony. Brian C. Willis, Resolving Disputes by Expert Determination: What Happens When Parties Select Appraisers, Accountants, or Other Technical Experts to Decide Disputes, Fla. B.J., July/August 2017, at 34, 36. Rather than rely only on evidence submitted by the parties, an expert will often conduct its own investigation and request from the parties the information it needs to resolve the factual issue. City of New York Bar Report at 7. As relevant here, accounting firms are commonly relied on as experts to resolve questions about post-merger financial schedules. *See id.*

With this understanding of the difference between arbitration and expert determination, we now turn to determining which type of dispute resolution the parties agreed to in the Purchase Agreement.

11

**B. The Purchase Agreement contains an agreement to submit narrow disputes to an accounting firm for expert determination, not arbitration.**

Deciding whether a party may be compelled to arbitrate is a two-step inquiry in which we consider (1) "whether there is a valid agreement to arbitrate between the parties," and if so, (2) "whether the merits-based dispute in question falls within the scope of that valid agreement." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (citation omitted). Although there is a presumption in favor of arbitration at step two, it does not apply at step one "when deciding whether a valid agreement exists." *Id.* at 220 n.3. We apply "ordinary state-law principles of contract law" to determine whether parties agreed to arbitrate. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 532 (3d Cir. 2009).

Here, Delaware contract law governs, as the parties selected it to apply in § 11.5 of the Purchase Agreement. Delaware black-letter contract law advises that "the role of a court is to effect[] the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).[3] We do

---

[3] The Delaware Supreme Court has also instructed that it "will not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate." *Kuhn Constr. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010) (en banc). Ambiguity exists when "the provisions in controversy are reasonably or fairly susceptible to different interpretations." *Id.* (citation omitted). In a Federal Rule of Appellate Procedure 28(j) letter, IAS challenges the applicability of this holding in *Kuhn*. ECF No. 48 at 1. We need not decide whether this portion of *Kuhn* applies because applying either standard—ordinary contract

this by interpreting "the four corners of the agreement." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). We read the contract as a whole and give each provision effect "so as not to render any part of the contract mere surplusage." *Kuhn Constr. v. Diamond State Port Corp*., 990 A.2d 393, 397 (Del. 2010) (en banc).

Parties often make our job easy by explicitly defining the role of the third-party decider. *See, e.g.*, *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) (the contract said that "the Accounting Firm shall be acting as an accounting expert only and not as an arbitrator"); *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006) (any claim stemming from the contract "shall be settled by arbitration . . . in accordance with the then-existing rules of the American Arbitration Association"). Parties need not use a "magic word," but because explicit language is the best way for parties to memorialize their intent, there is a strong "convention to include 'arbitration' terms to signal arbitration." *Bus Air*, *LLC v. Woods*, 2022 WL 2666001, at *3 (D. Del. July 11, 2022) (Andrews, J.).

The parties here did not provide a label, using neither the word "arbitration" nor, conversely, the phrase "expert, not arbitrator." To divine their intent in the absence of a clear designation, we search elsewhere in the agreement. *See Penton*, 252 A.3d at 462 ("If parties have not stated their intention explicitly, then a court will have to examine other aspects of the contract."). Looking at the language and structure of the Purchase Agreement, it becomes clear the

principles or *Kuhn*'s rule—yields the same result: the Purchase Agreement does not reveal an intent to arbitrate.

parties intended to have the third-party Accounting Firm act narrowly as an expert and not as an arbitrator.

*First*, the narrow scope of authority granted to the Accounting Firm points to an expert determination. "An agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties, . . . while the agreement for [expert determination] extends merely to the resolution of the specific issues . . ., all other issues being reserved for determination in a plenary action." *Id.* at 464 n.109 (citation omitted). Here, § 2.3(e) of the Purchase Agreement states that the parties "shall submit to an independent accounting firm . . . for resolution of any and all matters that remain in dispute and were properly included in the Notice of Disagreement." App. 84. The phrase "any and all matters" implies a broad grant of authority, but when read along with the phrase "properly included in the Notice of Disagreement," it is considerably narrower. That is so because a Notice of Disagreement can "only include disagreements which are based on the Statement not having been prepared in accordance with this Section 2.3 or which are based on mathematical errors." App. 84. The language in the contract narrows the dispute procedure to only accounting-related factual matters. This narrowing resembles an expert's determination more than arbitration.

Moreover, expert-determination provisions typically limit the "decision maker's authority to deciding a specific factual dispute within the decision maker's expertise." *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *6 (Del. Ch. Jan. 29, 2019). Here, the Purchase Agreement gives the Accounting Firm the authority to hear specific challenges in each of three years to, *inter alia*, the Earn

14

Out Statement for the relevant year. Those challenges are limited to whether the Statement was prepared in accord with generally accepted accounting principles, whether the parties had reasonable access to all working papers, and/or whether there were mathematical errors. These are all factual disputes within the normal expertise of an accountant, and that technical expertise weighs in favor of expert determination.[4]

**Second**, the Purchase Agreement provides only thirty days for the Accounting Firm to make its decision assuming the parties "use commercially reasonably good faith efforts." *See* App. 84. This is insufficient time for it to perform the "broad-based investigation" that an arbitrator would undertake. *Sapp R&R*, 2020 WL 1450563, at *5. Such a short turnaround time suggests the independent decision maker is not an arbitrator. *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 930-31 (Del. 2017) (independent auditor "had thirty days to make its conclusion," which reflected the "limited role of the adjudicator"); *Ray Beyond Corp.*, 2019 WL 366614, at *8 ("The parties' inclusion of a tight 20-day deadline [for resolution of disputes by the accountant] reinforces the

---

[4] We note that an adjudicator lacking legal training or experience is not *per se* ineligible from acting as an arbitrator. *TMIP Participants LLC v. DSW Grp. Holdings LLC*, 2016 WL 490257, at *12 (Del. Ch. Feb. 4, 2016) (explaining that even arbitrators "without legal training" can decide legal issues if the parties contracted for such a resolution). Sophisticated parties may bargain away their rights to any third-party adjudicator they would like. *Kuhn*, 990 A.2d at 396. Here, however, making the judgment call is an accounting firm tasked with answering narrow accounting-related questions, hence not a directional signal to arbitrate.

conclusion that the parties did not intend to vest [the accountant] with authority over wide-ranging matters.").

*Third*, the provision includes no procedural rules that would govern the alleged arbitration. It contains no reference to a standard set of rules, like those of the American Arbitration Association ("AAA"), nor does it outline its own rules for selecting the decision maker, conducting discovery, submitting briefing and evidence, or holding a merits hearing. Parties typically show an intention to arbitrate when their contract contains arbitration-like procedures. *See James & Jackson, LLC*, 906 A.2d at 80 (explaining that "reference to the AAA rules evidences a clear and unmistakable intent" to arbitrate). Conversely, the lack of rules indicates an agreement to call in an expert. *See Ray Beyond*, 2019 WL 366614, at *7-8 (noting that the "provisions contain no reference to procedural rules," which confirms that the contract "call[s] for an expert determination as opposed to an arbitration").

*Fourth*, § 11.17 of the Purchase Agreement says disputes should "be submitted to non-binding mediation," and if it fails, "either party may initiate litigation." App. 118. Under Delaware law, courts must give each provision and term effect "so as not to render any part of the contract mere surplusage." *Kuhn*, 990 A.2d at 396-97. Because arbitration agreements generally govern all disputes stemming from a contract, the inclusion of a mediation and litigation section in the Purchase Agreement undermines the argument that § 2.3(e) calls for arbitration.

These four characteristics of the Purchase Agreement show that the parties agreed to (1) expert determination by the Accounting Firm of narrow accounting-related questions and (2) mediation and litigation of all other disputes. Magistrate

16

Judge Burke, in his R&R, reached the same conclusion. *Sapp R&R*, 2020 WL 1450563, at \*4-6.

The District Court departed from that recommendation, held that the Purchase Agreement contains an arbitration agreement, and granted IAS's motion to compel arbitration. It provided two justifications for its departure. *First*, it focused on contract language stating that the Accounting Firm's resolution is "final and binding." Arbitrators typically make "final and binding rulings on issues of *law*"; experts do not. *Penton*, 252 A.3d at 466 (emphasis added) (citation omitted). The latter make final and binding factual decisions limited to specific questions within their area of expertise. City of New York Bar Report at 2. The Purchase Agreement does not state that the Accounting Firm may make final and binding decisions on *legal* issues. Instead, it says that the Earn Out Statement becomes "final and binding" on the Accounting Firm's review. App. 84, 86. This language, limited to the decision maker's expertise, is evidence that the Purchase Agreement calls for expert determination. *See Ray Beyond*, 2019 WL 366614, at \*6 n.70; *see also Kuhn*, 990 A.2d at 394-95 (contract provision called for expert determination, not arbitration, despite its inclusion of "final and binding" language). Although the calculation of IAS's EBITDA becomes final and binding after the expert completes its accounting analysis, the authority to resolve the parties' legal questions—like whether IAS violated the duty of good faith—remains with the courts.

*Second*, the District Court interpreted the Purchase Agreement as giving the Accounting Firm unlimited authority relating to the Earn Out Statement because of a capitalization discrepancy. It explained that the term "notice of

17

disagreement" is not capitalized in § 2.6(d) but is capitalized in § 2.3(e). As noted above, the Purchase Agreement defines the capitalized term, limiting it only to "disagreements which are based on the Statement not having been prepared in accordance with this Section [] or which are based on mathematical errors." App. 84. The Court reasoned that "when the same term appears in different sections of the agreement and is capitalized in one section but not the other, the non-capitalized term will have its 'ordinary, plain meaning'" rather than taking on the limitations of the capitalized and defined term. App. 8 (citation omitted). Under that assumption, the Court held that the uncapitalized "notice of disagreement" in § 2.6(d)—which governed—was not intended to limit the types of disputes the parties could raise. *Id.*

We perceive the lack of capital letters as a scrivener's oversight. While capitalization typically alters the meaning of words, § 2.6(d) (which contains an uncapitalized "notice of disagreement") directs the parties back to § 2.3(e) (which includes the capitalized "Notice of Disagreement"). The "notice of disagreement" in § 2.6(d) and the "Notice of Disagreement" in § 2.3(e) must have the same meaning for the direction back to be given effect. The contrary conclusion— that those two sections are governed by the same dispute procedure, but disputes under one section are narrow and disputes under the other may be expansive—does not track the many other factors in the Purchase Agreement revealing that these provisions, read together, call for narrow expert determination.

Overall, many features of the Purchase Agreement indicate the parties intended the Accounting Firm to be an expert, not an arbitrator. The reasons the District Court gave

18

to reach the opposite conclusion, perhaps correct in other contexts, do not persuade us here. The parties are not consigned to arbitrate and instead may continue to litigate their claims in federal court.[5]

* * *

We reverse the District Court's May 29, 2020, order compelling arbitration and vacate its May 26, 2022, order entering judgment for IAS. We thus remand the case for further proceedings consistent with this opinion.

---

[5] Because the parties did not agree to arbitrate, we must vacate the Court's order entering judgment for IAS based on the Accounting Firm's alleged arbitral award. But we do so without addressing Sapp's remaining argument that Eisner Advisory was an improper adjudicator—based on its corporate restructuring and alleged evident partiality—because those arguments stem from the Federal Arbitration Act, 9 U.S.C. § 10, which applies to agreements to arbitrate but does not necessarily apply to those for expert determination.