Filed 3/4/25  Disruptive Nanotechonology Limited v. Elliot CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DISRUPTIVE NANOTECHONOLOGY LIMITED, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DANIEL ELLIOT et al., <br><br> Defendants and Appellants. | B336941 <br><br> (Los Angeles County Super. Ct. No.23STCV19664) |

APPEAL from an order of the Superior Court of Los Angeles County, Stuart M. Rice, Judge.  Affirmed.

Kendall, Brill & Kelly, Patrick J. Somers, Robert E. Dugdale, Daniel Barlava for Defendants and Appellants Innova Medical Group, Inc., Pasaca Capital, Inc., and Charles Huang; Kirkland & Ellis, Michael Shipley, Mark Holscher, David Horowitz, Matthew Gamsin, and Steven Czak for Defendant and

Appellant Daniel Elliott; Brownstein Hyatt Farber Schreck, Jonathan C. Sandler for Defendant and Appellant Robert Kasprzak.

Paul Hastings, Susan K. Leader, Ali R. Rabbani, Alyssa K. Tapper, and Will Ostrander for Plaintiff and Respondent.

---

## INTRODUCTION

Plaintiff Disruptive Nanotechnology, Ltd. (DNL) entered into two contracts with defendant Innova Medical Group, Inc. relating to the sale of Innova's Covid-19 tests in the U.K. One contract was the Commission Agreement, under which DNL would get a commission for the sale of tests when DNL facilitated a sale between Innova and a buyer. The other contract was the Subdistribution Agreement, under which DNL would directly sell the product to buyers. DNL filed a complaint against Innova, its parent company Pasaca Capital, Inc., owner Charles Huang, and two principals at Innova, Daniel Elliott and Robert Kasprzak. DNL alleged that Innova breached the Commission Agreement by failing to pay certain commissions, and that the defendants fraudulently duped DNL into accepting decreased commissions so they could funnel to themselves commissions owed to DNL. DNL did not assert any claims under the Subdistribution Agreement.

Defendants moved to compel arbitration. The Commission Agreement does not have an arbitration provision; it anticipates that disputes will be decided by courts in Los Angeles County. The Subdistribution Agreement contains an arbitration provision, and defendants contend arbitration is warranted under that provision, because even though none of DNL's claims is based on the Subdistribution Agreement, defendants expect to rely on that agreement in their defense. The trial court denied

2

defendants' motion to compel arbitration because DNL's claims are based on the Commission Agreement, not the Subdistribution Agreement, and the parties did not consent to arbitrate disputes under the Commission Agreement.  We agree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Background[1]

DNL is a U.K. private limited company founded by Kimberley Thonger.  At the beginning of the Covid-19 pandemic in early 2020, DNL "worked to facilitate the supply of individual COVID-19 tests and the provision of medical and nursing staff to its corporate customers (including business premises, travel hubs, and event spaces)."

Innova is a California-based company that sells Covid-19 rapid antigen tests.  It is a wholly owned subsidiary of Pasaca, a private equity firm.  Huang founded Innova and Pasaca, and at various times served as chairman and chief financial officer of Pasaca and as chief executive officer of Innova.  Elliott is a former president, chief executive officer, and director of Innova, and former president and director of Pasaca.  Kasprzak is former in-house counsel, general counsel, chief legal officer, and director of Innova and Pasaca.

In April 2020, Thonger was introduced to Elliott, who was then the president and CEO of Innova.  Elliott asked if DNL would be interested in assisting Innova in navigating the U.K. procurement process and distributing Innova's Covid-19 tests in the U.K.  DNL agreed. DNL helped Innova apply to the U.K. Department of Health and Social Care (DHSC), then DNL managed the procurement process with the DHSC amid rapidly

---

[1]    The facts and quotes in this section are taken from the complaint unless otherwise noted.

changing standards and requirements. Approval for Innova's initial antibody test was denied.

DNL then applied for approval of a rapid antigen test Innova developed in the summer of 2020. DNL "work[ed] with Innova and the connections [DNL] had established within the DHSC to introduce the new antigen tests and explain the benefit they might provide in terms of mass testing." The "process took many months and involved the shipment of thousands of samples to DNL, which DNL, in turn, ensured were ultimately delivered to government testing laboratories in the U.K."

In August 2020, DNL and Innova entered into two written agreements, both of which were drafted by Innova. The first was the "Commission Agreement," under which DNL would facilitate the sale of Innova test kits in the U.K. in exchange for a commission on the sales. The Commission Agreement stated that DNL would "use its best efforts to assist in introducing [Innova] to Potential Buyers and facilitate, as needed, a sales transaction between [Innova] and the Potential Buyers." Upon the completion of any such transaction, Innova would pay DNL "an amount per Product sold . . . equal to ten percent (10%) of [the] sales price of the Products paid by a Buyer." According to the Commission Agreement, DNL would "not be purchasing or handling Products and shall therefore not be required to purchase, handle, pay for, or otherwise be engaged in purchases or handling (physically or otherwise) of Products. [DNL's] role under this Agreement is confined to enabling [Innova] access to useful information and opportunities with Potential Buyers so that [Innova] may be able to sell, transport, and use Products."

The Commission Agreement did not have an arbitration clause. Rather, it stated that the contract was governed by

California law, and the "venue for any action brought hereunder shall be proper only in Los Angeles County, California, USA." Language throughout the Commission Agreement anticipated that disputes would be addressed by a court. For example, it stated that in the event of a breach involving the confidentiality provisions, "the non-breaching Party shall have the right and remedy to have the provisions of this Article 4 specifically enforced by any court having equity jurisdiction and/or the right to obtain injunctive relief." The severability provision anticipated that a portion of the contract could be deemed illegal or unenforceable "by any court of competent jurisdiction." The Commission Agreement also stated, "5.06. Court Costs and Attorneys' Fees. If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover costs of court and reasonable attorneys' fees from the other party or parties to such action, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief that may be awarded."

The Commission Agreement had an integration clause stating, "This Agreement contains the entire understanding between the parties hereto concerning the subject matter contained herein. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein."

The second contract was the "Subdistribution Agreement," under which DNL would purchase products from Innova, and then sell those products within the U.K. The Subdistribution

5

Agreement stated that DNL would be "the authorized, exclusive independent subdistributor for the promotion and sale of the Products in the United Kingdom (the 'Territory')." The Subdistribution Agreement stated that Innova "agrees to sell the Products to DNL, and DNL agrees to purchase the Products from [Innova] according to the Price Sheet attached" to the Subdistribution Agreement. DNL was required to "make full payment to [Innova] for each respective order of Products in advance of the agreed shipping date." DNL could then sell the product to buyers for whatever price it chose.

The Subdistribution Agreement had an arbitration clause stating, "Any and all claims, disputes, controversies or differences arising out of, or in connection with, this Agreement, which cannot be settled satisfactorily by means of negotiation between the parties, shall be submitted to arbitration in accordance with the Commercial Arbitration Rules (the 'Rules') of the American Arbitration Association; provided, however, that this clause shall not be construed to preclude either party from bringing any action in any court of competent jurisdiction for injunctive or provisional relief, as necessary or appropriate." The Subdistribution Agreement also had an integration clause, which stated, "This Agreement (including the items incorporated herein) constitutes the entire agreement between the parties relating to the distribution of Products in the Territory; it supersedes all prior agreements and understandings between the parties relating to that subject, either oral or written, all of which are hereby expressly terminated; and this Agreement cannot be modified, except in a writing signed by both parties hereto."

As a result of DNL's efforts with the DHSC, "on or around September 16, 2020, Innova was awarded a $138,240,000

contract by the U.K. government to provide 18 million tests." Innova paid DNL the agreed-upon commission under the Commission Agreement.

**B.  Complaint**

In October 2020, Elliott approached DNL and represented that the market for the sale of Covid-19 tests was becoming increasingly competitive, so Innova could no longer sustain DNL's 10 percent commission rate.  Elliott said that in order for Innova to remain competitive in the market, DNL would need to agree to reduce its commission rate from 10 percent to 3 percent. Based on Elliott's representations, DNL agreed. The parties executed the First Amended Commission Agreement, which maintained that Innova would pay the 10 percent commission on the initial 18 million units of product, and stated that Innova would pay DNL a 3 percent commission on any product sold thereafter.[2]

According to DNL, Elliott's representations "were, at best, only half true," because Elliott and Kasprzak were engaging in a scheme to steal money from DNL and Innova.  Elliott represented to Innova and Huang that DNL's new commission would be 4 percent.  When Innova paid that 4 percent commission, it paid 3 percent to DNL and 1 percent to Nano Holdings, a company Elliott formed jointly with Kasprzak.  Elliott and Kasprzak told Innova that DNL had requested that a quarter of its commissions be paid to Nano Holdings.  DNL alleged, "[N]o one at Pasaca or

---

[2]     The parties sometimes refer to "amended" agreements.  In fact, the parties executed amendments to their agreements, which were mostly limited to specifying the terms that were being amended.  The amendments were not amended versions of the full agreements.

Innova ever questioned this arrangement or requested any verification that DNL (and not Elliott/Kasprzak) actually owned Nano Holdings." DNL also alleged that "[b]ased on the size of the contracts DNL helped Innova secure under the Commission Agreement, the 1% commission that Elliott and Kasprzak took for themselves amounted to, at a minimum, tens of millions of dollars," and DNL would not have agreed to amend the Commission Agreement had it known the truth.

In May 2021, Elliott again approached DNL and said that given Innova's "decreasing margins" and the expectation that the U.K. government would soon stop buying product in large quantities, Innova needed to further decrease DNL's commissions. DNL alleged that Innova also withheld $16.8 million in commissions already due in an effort to "force DNL to further reduce its commission." DNL agreed, and the parties entered into a Second Amended Commission Agreement, which set out a commission schedule as follows: 10 percent for the first 18 million units sold prior to January 1, 2021; 3 percent for any units beyond the initial 18 million units sold prior to January 1, 2021; 2 percent for any number of units sold between January 1, 2021 and March 13, 2021, and either 1 percent or no commission for any units sold thereafter, depending on whether the product was sold as a result of a public bidding process. DNL alleged that the Second Amended Commission Agreement "retrospectively reduced commission rates on contracts that had already been awarded to Innova by the U.K. government, on which DNL had already contractually earned commissions at a higher rate," but which Innova had not yet paid. Following the execution of the Second Amended Commission Agreement, "through DNL's work

on behalf of Innova in the U.K., Innova won at least four additional contracts worth over a billion dollars."

DNL alleged that the Second Amended Commission Agreement was also procured through Elliott's fraud. Elliott continued to represent to Innova that DNL was receiving a 4 percent commission, while Elliott was actually diverting the remainder to himself and Kasprzak. Text messages between Elliott and Kasprzak showed them texting about sending Commission Agreement amendment to Innova to "get us all paid," and crowing about the resulting $33.5 million wire transfer to Nano Holdings's account. DNL alleged that Innova and Huang did not notice the ongoing fraud.

In addition, Innova was not struggling with minimal margins as Elliott had represented to DNL. Instead, "much of the money Innova made from its dealings in the U.K. were [*sic*] ultimately funneled out of the company and up to its parent (Pasaca) where it was spent on a series of lavish benefits, including a private jet, multi-million dollar properties, and sizable investments in third party businesses." DNL alleged that it would not have entered into the Second Amended Commission Agreement if it had known that Elliott's representations were false.

By August 2021, Innova had fallen behind on paying commissions it owed to DNL. DNL believed that Innova owed it approximately $15 million. Innova "refused to pay this amount to DNL." Instead, Elliott and Kasprzak demanded that DNL accept a one-time payment of $8 million and sign a Third Amended Commission Agreement in August 2021 stating, "In consideration, in lieu, and in full and final satisfaction of all unpaid Commissions accrued or payable through and including

9

the date of this Amendment, [Innova] shall pay to [DNL] US$8,000,000 in cash." DNL alleged that Innova "had all the bargaining power" and DNL lacked accurate information, so DNL agreed and signed the Third Amended Commission Agreement.

In November 2022, counsel for Innova and Pasaca informed DNL that they were investigating the ownership of Nano Holdings and potential misconduct by Innova officers. DNL did not discover the extent of the fraud until February 2023, when Innova and Pasaca filed a complaint in Nevada state court alleging that Elliott and Kasprzak "lied about why they sought reduced commissions through the Purported Amendments [to the Commission Agreement], had established Nano Holdings in order to syphon off payments Innova and Pasaca had agreed to pay to DNL, and had defrauded DNL out of hundreds of millions of dollars in the process." DNL further alleged it discovered that Elliott's claims of minimal margins for product sold in the U.K. were not true; in fact Innova and Pasaca were paying Elliott and Kasprzak "hundred million dollar compensation packages." Meanwhile, "no one from Innova/Pasaca ever verified the ownership structure of Nano Holdings before wiring over $100 million to an entity that was not a party to the Commission Agreement."

DNL alleged in its complaint that the amendments to the Commission Agreement must be rescinded because they were procured by fraud. It estimated that the fraud cost it approximately $500 million in unpaid commissions. DNL further alleged that Innova, Pasaca, and Huang were alter egos that failed to maintain separate corporate identities and commingled funds. DNL alleged causes of action for fraud in the inducement of the amendments to the Commission Agreement, common law

10

fraud, conversion, money had and received, unjust enrichment, tortious interference with prospective economic relations, tortious interference with contractual relationship, negligent supervision of Elliott and Kasprzak, breach of contract for the Commission Agreement, and breach of the implied covenant of good faith and fair dealing. All of DNL's claims were based on the Commission Agreement and Innova's failure to pay commissions; the Subdistribution Agreement is mentioned only once in the complaint, as background information. DNL prayed for damages in excess of $500 million, punitive damages, rescission of the amendments to the Commission Agreement, attorney fees, costs, and prejudgment interest.

## C. Motions to compel arbitration

Defendants filed three motions to compel arbitration: one by Kasprzak; one by Elliott, and one by Innova, Pasaca, and Huang.

Defendants alleged that "the Subdistribution Agreement contains a broad arbitration provision requiring that '[a]ny and all claims, disputes, controversies or differences arising out of, or in connection with' the Agreement proceed in arbitration." Defendants argued that this agreement "mandates that the parties address *any dispute* arising between them in arbitration."

Defendants argued that the arbitration provision in the Subdistribution Agreement controlled, because "the Subdistribution Agreement and Commission Agreement were contemporaneously negotiated, executed, and amended, and . . . the Agreements intertwined to govern DNL's business relationship with Innova." They asserted that "there can be no doubt that DNL's claims have their roots in the parties' contractual relationships, including the Subdistribution

11

Agreement." Defendants stated that in consideration for DNL's reduced commissions, "the parties amended the Subdistribution Agreement to extend DNL's exclusive distribution territory to over 53 new countries and reduced the price at which DNL purchased rapid antigen tests from Innova from $20 to $5—a 75% reduction. Not only does this contradict DNL's claims on the merits, it demonstrates that the Commission and Subdistribution Agreements were inextricably interrelated such that DNL's claims here necessarily arise out of and are connected to the Subdistribution Agreement." Defendants also asserted that the products covered by the Commission Agreement and the Subdistribution Agreement were the same, and "the purpose of the Agreements was functionally identical"—to promote the sale of Innova products in the U.K. Defendants argued that "notwithstanding DNL's misleading attempts to portray its claims (and relationship with Innova) as relating to and arising solely out of the Commission Agreement referenced in its Complaint, DNL's claims are inextricably intertwined with questions about its overall business relationship with Innova."

Defendants stated that the U.K. government ultimately purchased over a billion tests from Innova. The price of tests in the U.K. started at $20 per test for rapid antigen tests, but "[t]he U.K. government . . . negotiated with Innova to reduce the price of its rapid antigen test in subsequent contracts." "As a result, Innova renegotiated the terms of the Agreements" with DNL, and "the amendments were negotiated and agreed on contemporaneously." Thus, as DNL's commission was reduced to 3 percent in the First Amended Commission Agreement in October 2020, "as additional consideration for DNL, the parties also revised the Subdistribution Agreement to expand the

definition of 'Territory' from just the U.K. (and the Republic of Ireland) to over 50 countries and reduced the price at which DNL could purchase rapid antigen tests from Innova from $20 per test to only $5 per test." "Thereafter, Innova and DNL further amended the Commission Agreement in light of the increasingly competitive market for COVID-19 tests." Defendants asserted, "There can be no dispute that these events, which give rise to DNL's claims here, relate to conduct covered by the parties' agreement to arbitrate contained in their Subdistribution Agreement since that agreement reflects and concerns what was said and done over the course of the parties' overall business relationship."

Defendants further argued that the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (FAA) controlled. Defendants asserted that any questions about arbitrability should be decided by the arbitrator. Defendants acknowledged that the individual defendants were not parties to the Subdistribution Agreement, but asserted that they were nevertheless entitled to enforce the arbitration provision as Innova's agents at the time the agreements were signed.

**D.    Opposition**

In its opposition to the motions to compel, DNL stated that it brought its lawsuit only to recover unpaid commissions under the Commission Agreement, which was a fully integrated contract with no arbitration clause. DNL asserted, "Defendants' position . . . attempts to rewrite the two Agreements (which they drafted in the first instance) to erase the dispute resolution procedures called for in the Commission Agreement (the sole subject of DNL's claims herein) and replace them with an

13

arbitration provision from a separate agreement unrelated to DNL's claims."

DNL asserted, "The Complaint unambiguously relates solely to the commissions DNL contends it is owed under the Commission Agreement." It noted that "the Subdistribution Agreement does not incorporate or even reference the Commission Agreement or any commissions owed to DNL." It further stated that "the Commission Agreement and Subdistribution Agreement contain a number of differences making clear that they are not only governed by completely separate commercial relationships, but expressly contemplated different methods of dispute resolution," because the Commission Agreement has a venue selection clause for courts in Los Angeles County, while the Subdistribution Agreement has an arbitration clause. In addition, both agreements stated that they were fully integrated contracts. DNL asserted that the contemporaneous timing of the two contracts and amendments did not alter the express terms of the contracts, but instead reinforced that the parties intended the agreements to be separate.

Thonger filed a declaration stating that he signed the agreements and amendments on behalf of DNL. He stated, "It was Innova's decision to have two separate agreements with different and conflicting terms, rather than one integrated agreement. This made sense to me because the Commission Agreement and Subdistribution Agreement related to two different business models."

Defendants filed replies in support of their three motions.

Ruling

The court issued a tentative ruling denying defendants' motions. Following a hearing, the trial court issued a written

14

ruling denying defendants' motions. The court first rejected defendants' contention that an arbitrator should decide arbitrability. The court then found that "all of [DNL's] claims arise out of the Commission Agreement, or from the common law, not the Subdistribution Agreement." The court stated that the two agreements, "though simultaneous, concerned two different types of transactions," and "[n]either agreement references the other, nor does either agreement require the other for its operation." Although the two agreements "necessarily . . . overlap in time due to the simultaneous execution" of them, there was "no overlap in subject matter, neither in the text of the contracts nor the circumstances surrounding them."

The court also noted that "the agreements contain significant indicia that the parties intended them to be taken separately," such as both agreements having "integration clauses which set forth strong boundaries between the two agreements." The court noted that the Commission Agreement included references to courts and actions in law or equity, which "bespeak an understanding that disputes over the Commission Agreement would not be arbitrated."

The court found that based on language in the two agreements, "it appears to the Court that while the parties did intend to arbitrate any disputes arising under or relating to the Subdistribution Agreement, the parties intended *not* to arbitrate any disputes arising under the Commission Agreement." The court continued, "The dispute between [DNL] and Defendants over the reduction of the commission in the Commission Agreement does not have its origin or genesis in the Subdistribution Agreement. While Defendants may contend, based on undisputed evidence, that [DNL] agreed to the

15

reduction of the commission in exchange for amendments to the Subdistribution Agreement, that does not create a 'significant relationship' between [DNL's] claims and the Subdistribution Agreement. The Commission Agreement's intent is to not permit arbitration of claims arising under it. Under the FAA, as under California law, arbitration 'is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.' [Citations.]" The court also noted that the amendments to the agreements provided the parties opportunities to express any changed intentions regarding arbitration, but the parties did not do so. The court therefore concluded that "there was no agreement to arbitrate the subject claims, which arise out of the Commission Agreement. The arbitration clause in the Subdistribution Agreement does not apply to those claims."

All defendants timely appealed.

## DISCUSSION

Defendants assert that the trial court erred in finding that DNL's claims did not fall under the arbitration clause of the Subdistribution Agreement. When the evidence is not in conflict, we review a trial court's denial of a motion to compel arbitration de novo. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*).)

""""Under both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate."""" (*Herzog v. Superior Court* (2024) 101 Cal.App.5th 1280, 1293.) We apply California law to determine the answer to this threshold question. (*Ibid.*; see also *Pinnacle, supra*, 55 Cal.4th at p. 236.) The party seeking

16

arbitration bears the burden of proving the existence of an arbitration agreement.  (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

The parties agree that the Commission Agreement does not include an arbitration clause.  Instead, that contract expressly contemplates that disputes will be resolved by a court.  It states that the contract is governed by California law, and the venue for any action "brought hereunder" is Los Angeles County.  The Commission Agreement also states that confidentiality issues shall be "enforced by any court having equity jurisdiction and/or the right to obtain injunctive relief."  The severability provision notes that a "court of competent jurisdiction" could deem part of the contract unenforceable.  The Commission Agreement also allows for an award of "court costs" along with attorney fees arising from "any action at law or in equity" arising from the contract, the amount to be determined "by the court in the trial of such action or . . . in a separate action brought for that purpose."

DNL's claims are based on the Commission Agreement.  In its contract-based causes of action, DNL alleges that defendants breached the Commission Agreement by failing to pay agreed-upon commissions, breached the implied covenant of good faith and fair dealing associated with the Commission Agreement, committed fraud in inducing changes to the Commission Agreement, and that defendants Elliott and Kasprzak interfered with DNL and Innova's economic and contractual relationship based on the Commission Agreement. In its non-contract causes of action, DNL alleges fraud, conversion, money had and received, unjust enrichment, and negligent supervision of Elliott and Kasprzak, which are all based on adjustments to DNL's commissions.  DNL's alleged damages relate to unpaid commissions under the Commission Agreement. DNL also prays

17

for punitive damages and rescission of the amendments to the Commission Agreement. None of these claims relies on or arises from the Subdistribution Agreement, which is mentioned only once in the complaint as background information.  DNL's claims and alleged damages are not based on the subject matter of the Subdistribution Agreement, which addressed DNL's direct sale of Innova tests.

The Commission Agreement contains an integration clause, stating in part that there are "no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein."  "When the parties to an agreement express their intention that it is the final and complete expression of their agreement, an integration occurs. Such a contract may not be contradicted by evidence of other agreements."  (*Williams v. Atria Las Posas* (2018) 24 Cal.App.5th 1048, 1051; see also *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 14 ["When the parties to an agreement incorporate the complete and final terms of the agreement in a writing, such an integration in fact becomes the complete and final contract between the parties. Such a contract may not be contradicted by evidence of purportedly collateral agreements.  As a matter of law, the writing is the agreement."].)

Here, the Commission Agreement is the complete expression of the parties' agreement as to that aspect of their relationship.  The parties are sophisticated, and they entered into two separate agreements with different terms addressing two separate aspects of their relationship.  They amended these agreements multiple times, yet never materially changed the provisions regarding resolution of disputes.  Reference to the

18

Subdistribution Agreement is not required to determine the parties' intent.

Case authority also holds that when there are contemporaneous contracts, a party may not be compelled to arbitrate claims that arise out of the contract that does not contain an arbitration provision. In *Cardiff Equities, Inc. v. Superior Court* (2008) 166 Cal.App.4th 1541 (*Cardiff*), for example, the case involved two separate contracts: a partnership agreement, which documented an investment in a limited partnership and contained an arbitration provision, and a guaranty of repayment of the investment, which did not include an arbitration provision. (166 Cal.App.4th at p. 1544.) The plaintiff, Cardiff, filed a complaint alleging causes of action based on both agreements; the court sent the case to arbitration. Cardiff dismissed its complaint without prejudice, and filed a second complaint based only on the guaranty, which did not have an arbitration agreement. The trial court found that Cardiff's case was "an attempt to plead around" the court's arbitration order, and granted the defendant's motion to stay the second case. (*Id.* at p. 1547.)

In a writ proceeding, the Court of Appeal reversed. It agreed that Cardiff had a right to "immediately litigate the Guaranty claims in the trial court and to file another action and arbitrate its Partnership claims at a later date." (*Cardiff, supra*, 166 Cal.App.4th at p. 1550.) The appellate court rejected the trial court's reasoning that the guaranty and partnership claims were inextricably intertwined. It noted that the guaranty allowed "claims on that agreement to be brought independently," so Cardiff's second action "effectively severed the Partnership claims from the Guaranty claims. Since Cardiff intends to

19

pursue the Guaranty claims independently, as permitted by the Guaranty, there is no longer any basis for arbitration of the Guaranty claims." (*Id*. at p. 1551; see also *Alticor, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa*. (6th Cir. 2005) 411 F.3d 669, 673 [arbitration not warranted where the claim related to an insurance policy, and "the arbitration provision is limited to 'disputes or differences arising out of or relating to' the Premium Payment Agreement," which was a separate contract]; *Johnson v. Walmart Inc*. (9th Cir. 2023) 57 F.4th 677, 681 (*Johnson*) [arbitration was not warranted when the parties had two contracts, and the plaintiff's "claim against Walmart does not arise out of the contract containing the arbitration agreement"].)

Here, similarly, DNL's claims are not based on the Subdistribution Agreement. "[T]he threshold questions presented by every motion or petition to compel arbitration are whether an agreement to arbitrate exists [citations] and, if so, whether the parties' dispute falls within the scope of that agreement." (*Ahern v. Asset Management Consultants, Inc*. (2022) 74 Cal.App.5th 675, 687.) "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." (*Granite Rock Co. v. International Broth. of Teamsters* (2010) 561 U.S. 287, 297 [emphasis in original] (*Granite Rock*).) Here, there is no agreement to arbitrate disputes arising from the Commission Agreement. The Commission Agreement itself demonstrates the parties anticipated that such disputes would be addressed in court.

Defendants propose that we begin our inquiry by finding a valid arbitration agreement between the parties in the Subdistribution Agreement. Then, following federal law and its

presumption in favor of arbitration, we should determine "whether the merits-based dispute in question falls within the scope of that valid agreement." (Quoting *Sapp v. Industrial Action Services, LLC* (3d Cir. 2023) 75 F.4th 205, 212.) Defendants argue that the answer to that question is yes, because the Subdistribution Agreement's arbitration provision is "broadly written" to encompass all disputes "in connection with this Agreement."

We disagree with this approach, because the threshold question here is the *existence* of an agreement to arbitrate disputes based on the Commission Agreement, not the scope of an existing arbitration agreement. (See, e.g. *Johnson, supra,* 57 F.4th at p. 681 ["Johnson contests the existence, not the scope, of an arbitration agreement that would encompass this dispute"].) When the existence of an arbitration agreement is at issue, the presumption in favor of arbitrability does not apply. (*Ibid*.) The "presumption favoring arbitration" applies "only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended." (*Granite Rock, supra*, 561 U.S. at p. 303; see also *Duran v. EmployBridge Holding Company* (2023) 92 Cal.App.5th 59, 66 ["The policy favoring arbitration . . . does not apply when unambiguous language shows the parties did not agree to arbitrate all or a part of the dispute"]; *Thompson v. Toll Dublin, LLC* (2008) 165 Cal.App.4th 1360, 1370 ["The strong policy in favor of arbitration may not be used to permit a party to enforce provisions of an arbitration agreement that . . . either do not exist or were so poorly drafted that another party cannot be presumed to have agreed to them"].) Here, defendants have not met their

21

burden to demonstrate that the parties had an arbitration agreement addressing DNL's claims.

Examining defendants' contentions *arguendo*, we are not persuaded. Defendants are correct that courts construing the phrase "arising in connection with" in an arbitration clause typically interpret that phrase broadly. (See, e.g., *Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 721.) However, such a broad reading "reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." (*Ibid*.) The court "examine[s] the factual allegations raised to determine which . . . causes of action are arbitrable." (*Ibid*.) Here, the factual allegations in the complaint show that DNL's claims have their origin in the Commission Agreement, and do not have a significant relationship to the Subdistribution Agreement.

Defendants argue that DNL's claims fall under the Subdistribution Agreement's arbitration clause "because DNL's claims cannot be fully and truly evaluated or adjudicated without reference to the Subdistribution Agreement." They assert that "reductions of DNL's commission rate under the Commission Agreement[ ] were in fact paid for by a corresponding expansion of the territories in the Subdistribution Agreement" and a "reduction of the price at which DNL purchased rapid antigen tests from Innova." Defendants assert that DNL therefore cannot prove its allegations about fraud because these "amendments to the Subdistribution Agreement are central to addressing DNL's claims that the amendments to the Commission Agreement were wrongfully induced." Defendants also argue that "no amount of artful pleading on the part of DNL can obscure the fact that this

dispute is, at the very minimum, 'in connection with' the Subdistribution Agreement."

In essence, defendants assert that the arbitrability of DNL's claims must be assessed by considering how defendants might present their defense or what remedies might be warranted once liability has been established. The authorities defendants cite do not support this proposition. Defendants rely on a treatise, *Commercial Arbitration* by Thomas H. Oehmke and Joan M. Brovins (2024 update) (*Oehmke*), which states, "When there are several interrelated agreements, one may be silent as to arbitration while another may mandate arbitration. If a broad arbitration clause is found in one of these interrelated agreements, arbitration may be required if the dispute is arbitrable under one of those contracts." (Oehmke, § 6:8.)

The parties debate whether the contracts are "interrelated." We need not wade into this debate, because neither contract was "silent as to arbitration." The Subdistribution Agreement had an arbitration clause, and the Commission Agreement clearly anticipated that disputes would be resolved in court proceedings, not arbitration.

The case authorities defendants cite also do not support their conclusion. In *Gore v. Alltel Communications, LLC* (7th Cir. 2012) 666 F.3d 1027, for example, the plaintiff agreed to arbitration in one of a series of cellular service agreements as his account passed from one company to another in various mergers. The Seventh Circuit held that under Illinois law, the arbitration agreement between the plaintiff and defendant was broad enough to address the plaintiff's allegations about earlier breaches by companies the defendant acquired. *Gore* is not similar to the

instant case, in which two sophisticated parties signed two different contracts with materially different terms.

Defendants also cite *Nestle Waters North America, Inc. v. Bollman* (6th Cir. 2007) 505 F.3d 498, in which the plaintiff and defendants signed a purchase and sale agreement, which contained an arbitration agreement, and executed other documents that "var[ied] significantly regarding arbitration," including a deed. (505 F.3d at p. 501.) The Sixth Circuit noted that the plaintiff was "entitled to seek relief solely on the basis of language in" the deed, and the defendants' "artful characterization of the claim in this case should not be sufficient to turn an otherwise non-arbitrable claim into an arbitrable one." (*Id.* at p. 503.) However, the court also found that the purchase and sale agreement, the document with the arbitration agreement, was an "umbrella agreement governing the parties' overall relationship," and therefore the parties intended the arbitration clause to apply to disputes involving the other documents. (*Id.* at p. 506.) Here, by contrast, the contracts were parallel and defined the parties' rights and responsibilities in different roles—one was not an umbrella agreement under which the other was executed.

Defendants also rely on *Answers in Genesis of Kentucky, Inc. v. Creation Ministries International, Ltd.* (6th Cir. 2009) 556 F.3d 459, in which two related organizations dedicated to teaching creationism attempted to resolve ongoing conflicts by signing a memorandum of agreement (MOA), which had an arbitration provision stating that "'in the event of a disagreement' the parties would 'submit the matter to Christian arbitration.'" (556 F.3d at p. 463.) The parties also signed an agreement relating to the use of copyrighted works for their

24

published materials, the "DOCL." (*Id*. at p. 464.) The party seeking arbitration asserted that the broadly worded arbitration agreement applied to all disputes between the parties, not "only those issues whose origin one can find within the four corners of the MOA and DOCL." (Id. at p. 470.) The Sixth Circuit agreed, stating, "The clear language of the arbitration clause says 'this Agreement or any related agreements.' To limit the scope of the arbitration clause to only the MOA and DOCL would read the words 'or any related agreements' out of the contract." (*Ibid*.)

Defendants assert that the same reasoning should apply here, because "in the same transaction" underlying the Commission Agreement, "DNL received valuable concessions from Innova" in the Subdistribution Agreement, which "wholly refutes DNL's claim that it was defrauded into giving something away for nothing." But here, neither the Subdistribution Agreement nor the Commission Agreement referred to other agreements, and both contracts had integration clauses.

"Arbitration is "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." (*Coinbase, supra*, 602 U.S. at p. 148.) Here, DNL's claims are based on the Commission Agreement, and defendants have not demonstrated that the parties agreed to arbitrate disputes based on the Commission Agreement. Thus, defendants' motions to compel arbitration were properly denied.[3]

---

[3] Because we find no agreement to arbitrate DNL's claims, we need not address defendants' contention that the non-Innova defendants have standing to compel arbitration.

25

## DISPOSITION

The trial court's order denying defendants' motions to compel arbitration is affirmed.  DNL is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


ZUKIN, ACTING P. J.


WILEY, J.*

---

\*   Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned to Division Four, by the Chief Justice pursuant to article VI, section 6 of the California Constitution.